[Cite as *Poe v. Univ. of Cincinnati*, 2013-Ohio-5451.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Sharon L. Poe, Admr., etc., | : | |
| Plaintiff-Appellant, | : | |
| v. | : | No. 12AP-929 |
| | | (Ct. of Cl. No. 2010-11340) |
| University of Cincinnati, | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellee, | : | |
| (Michael Canady, M.D., | : | |
| Defendant-Appellee). | : | |
| Sharon L. Poe, Admr., etc., | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 13AP-210 |
| | | (Ct. of Cl. No. 2010-11340) |
| University of Cincinnati, | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 12, 2013

*Thomas D. Hunter*; and *Lawrence A. Riehl*, for Sharon L. Poe.

*Michael DeWine*, Attorney General, and *Brian M. Kneafsey, Jr.,* for University of Cincinnati.

*Arnold Todaro & Welch, Co., LPA, Karen L. Clouse, Kevin Popham*, and *Gerald Todaro*, for Michael Canady, M.D.

APPEALS from the Court of Claims of Ohio

CONNOR, J.

{¶1}   Plaintiff-appellant, Sharon L. Poe ("Poe"), and defendant-appellant, University of Cincinnati ("UC"), appeals from a judgment of the Court of Claims of Ohio granting defendant-appellee, Michael Canady, M.D., civil immunity pursuant to R.C. 9.86 and 2743.02(F) in Poe's medical negligence and wrongful death lawsuit.  Because Dr. Canady does not meet the applicable statutory definition of a state employee, he is not entitled to R.C. 9.86 immunity and therefore we reverse the judgment of the Court of Claims of Ohio.

## I. FACTS AND PROCEDURAL HISTORY

{¶2}   On October 20, 2008, Dr. Canady performed a lap band procedure on David E. Malone at the Holzer Clinic, a private medical center in Gallipolis, Ohio.  A fifth-year resident from UC, a state university, observed Dr. Canady during Malone's surgery and assisted in the procedure by holding the surgical camera and tying some of the laparoscopic knots.  Malone was sent home to recover after the operation, but returned to the Holzer Clinic's emergency department on October 25, 2008, complaining of abdominal pain and bloating.  Clinic staff admitted Malone to Holzer's intensive care unit, where he died shortly after going into cardiac arrest.

{¶3}   On October 19, 2010, Poe, decedent's mother and the administrator of his estate, filed a civil action against the University of Cincinnati in the Court of Claims, alleging medical negligence and wrongful death.  On October 20, 2010, Poe filed a related suit in the Gallia County Court of Common Pleas against Dr. Canady, Holzer Clinic, and several other medical professionals at the clinic.  Dr. Canady responded by filing a motion to dismiss in the court of common pleas, claiming R.C. 9.86, 109.36, and 2743.02(F) provided him civil immunity since he was a state employee and he was acting within the scope of employment during Malone's surgery.  As a result of Dr. Canady's motion, Poe filed a motion for immunity hearing in the Court of Claims on September 21, 2011.  The Court of Claims granted the motion on November 29, 2011 and conducted an evidentiary hearing on August 9, 2012 to determine whether Dr. Canady was immune from liability in the underlying matter; the court permitted Dr. Canady's representative to participate in the hearing along with the named parties to the action.  In a judgment entry filed

September 27, 2012, the trial court found Dr. Canady was entitled to personal immunity under R.C. 9.86 and 2743.02(F).

## II. ASSIGNMENTS OF ERROR

{¶4}    Poe appeals, assigning the following error:

THE COURT BELOW ERRED IN HOLDING THAT APPELLEE DR. CANADY WAS ENTITLED TO IMMUNITY UNDER R.C. 9.86, R.C. 2743.02(F) AND R.C. 109.36.

UC appeals, assigning the following error:

THE TRIAL COURT ERRED WHEN IT GRANTED IMMUNITY TO APPELLEE DR. CANADY UNDER R.C. 9.86, R.C. 2743.02(F) AND R.C.109.36.

As the assignments of error presented for review both concern whether Dr. Canady was entitled to immunity, we will address them together.

## III. ASSIGNMENTS OF ERROR—CIVIL IMMUNITY

{¶5}    Poe and UC jointly contend that the Court of Claims erred in interpreting R.C. 9.86, 109.36, and 2743.02(F) as granting Dr. Canady civil immunity.

{¶6}    R.C. 9.86 provides that "no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner." Notably, "R.C. 9.86 is inclusive and makes no exception for persons who may simultaneously have other employment interests."  *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208, ¶ 25.

{¶7}    R.C. 2743.02(F) establishes the procedure for determining the immunity R.C. 9.86 grants, stating "[a] civil action against an officer or employee" alleging "the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities" or alleging "the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner" first must "be filed against the state in the court of claims that has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity

under section 9.86" and "whether the courts of common pleas have jurisdiction over the civil action."  R.C. 2743.02(F).  Thus, "whether a doctor is entitled to personal immunity from liability under R.C. 9.86 involves a question of law, an issue over which the Court of Claims has exclusive, original jurisdiction."  *Marotto v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-27, 2012-Ohio-6158, ¶ 9, citing *Nease v. Med. College Hosps.*, 64 Ohio St.3d 396, 400 (1992); *Johns v. Univ. of Cincinnati Med. Assocs., Inc.*, 101 Ohio St.3d 234, 2004-Ohio-824.  If the Court of Claims determines the employee is immune from liability, the claimant in the underlying action must assert his or her claims against the state and the state shall be liable for the employee's deeds or omissions.  R.C. 2743.02(A)(2).

{¶8}    To determine whether an alleged employee is entitled to civil immunity in accordance with R.C. 9.86, the Court of Claims must undertake a two-part analysis.  The court first must determine " 'whether the individual was a state officer or employee' "; if the court concludes that " 'the practitioner is not a state employee, the analysis is completed and R.C. 9.86 does not apply.' "  *Phillips v. The Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-414, 2013-Ohio-464, ¶ 7, quoting *Theobald* at ¶ 14, 30.  If the court instead concludes that the practitioner is a state employee, it must determine "whether the individual was acting within the scope of employment when the cause of action arose."  *Id.*

### A. State Employee Status

{¶9}    R.C. 109.36(A)(1)(a) through (d) "defines who is a state officer or employee for purposes of R.C. 9.86."  *Engel v. Univ. of Toledo College of Medicine*, 130 Ohio St.3d 263, 2011-Ohio-3375, ¶ 8 ("*Engel I*"), citing R.C. 9.85(A); *Theobald* at ¶ 14.  In the matter sub judice, only subsection (a) is relevant; it provides that a state employee is a "person who, at the time a cause of action against the person arises, * * * is employed by the state."  R.C. 109.36(A)(1)(a).

{¶10}    Unfortunately, defining a state employee as a person employed by the state " ' "is completely circular and explains nothing." ' "  *Phillip*s at ¶ 9, quoting *Bryson v. Middlefield Volunteer Fire Dept., Inc.,* 656 F.3d 348, 353 (6th Cir.2011), quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (interpreting similar

definition under Title VII and ERISA). In cases where federal statutes use but do not helpfully define the term "employee," the United States Supreme Court instructs courts to rely on common law agency principles. *Id.*, citing *Darden* at 322-24; *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 751-52 (1989); *Natl. Labor Relations Bd. v. United Ins. Co. of Am.,* 390 U.S. 254, 258 (1968). In this context, relevant considerations when determining " 'whether a hired party is an employee' " include " 'the hiring party's right to control the manner and means by which the product is accomplished; * * * the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.' " *Darden* at 323-24, quoting *Reid* at 751-52, citing Restatement of the Law 2d, Agency, Section 220(2) (1958); Rev. Rul. 87-41, 1987-1 C.B. 296, 298-299.

{¶11} The Supreme Court of Ohio considered when a practitioner is "employed by the state" for purposes of R.C. 9.86 immunity in *Engel I. Id.* at ¶ 7. In *Engel I*, the court set forth three "helpful" factors which touch upon many of the considerations listed in *Darden*, though the court also "emphasize[d] that other factors may be considered." *Id.* at ¶ 10. The three factors the court identified and examined were (1) whether the state and the alleged employee had a "[c]ontractual relationship," (2) whether the state had control over the alleged employee's actions, and (3) whether the state, or a private entity with a "symbiotic relationship" with the state, paid the alleged employee for his services. R.C. 109.36(A)(1)(a); *id.* at ¶ 11, 15.

{¶12} Here, to determine whether Dr. Canady was a state employee under R.C. 109.36(A)(1)(a), the Court of Claims framed its analysis around the three factors the Supreme Court articulated in *Engel I.* Applying these factors, the Court of Claims found that there was a contract of employment between UC and Dr. Canady, that the state had control over Dr. Canady's actions, and that a symbiotic relationship existed between the

state and the Holzer Clinic, the entity which paid Dr. Canady.  Consequently, the court concluded, "Dr. Canady was an employee of UC as that term is used in *Engel* [*I*]." (Sept. 27, 2012 Judgment Entry, 8.)

{¶13}  On appeal, UC and Poe challenge the Court of Claims' findings as to each *Engel I* factor, but they do not take issue with the court's decision to frame its judgment around these factors.  In fact, UC argues that "[a]pplying those same [*Engel I*] factors in this case should lead to the conclusion that Dr. Canady was * * * not a state employee or officer for purposes of R.C. 9.86." (UC's Brief, 6.)

{¶14}  Consequently, while we are mindful that the *Engel I* court did not intend its three factors as a "formal test," in the present matter the factors provide an appropriate and useful framework from which to approach an inquiry into Dr. Canady's alleged status as a state employee.  *Id.* at ¶ 10.  *See also Phillips* at ¶ 10-15 (applying the three *Engel I* factors to determine whether a physician was "[a] person * * * employed by the state" under R.C. 109.36(A)(1)(a)).

### 1. Employment/Contractual Relationship

{¶15}  The Court of Claims found Dr. Canady "did have an employment contract with defendant" since he "was an owner and shareholder of the Holzer Clinic, which contracted with UC to teach and train UC residents while on rotation at the Holzer Clinic." (Sept. 27, 2012 Judgment Entry, 5.)

{¶16}  The court based its finding on Holzer Clinic's resident training arrangement with UC, which is set forth in the "Program Letter of Agreement between University Hospital/University of Cincinnati College of Medicine General Surgery Residency Training Program and the Holzer Clinic, Inc., Department of Surgery," executed in 2008 by Holzer Clinic Local Site Director Ronn Grandia, M.D., and Administrative Representative T. Wayne Munro, M.D., as well as UC representatives Timothy Pritts, M.D., and Andrew Filak, M.D.  The agreement specifically names Dr. Grandia as the "Local Director at Participating Site," but otherwise identifies the physicians "responsible for education and supervision at Participating Site" as simply the "Surgical Teaching Faculty, Holzer Clinic."  (2008 Program Letter of Agreement, 1.)

{¶17} In detailing the participating clinic physicians' commitments pursuant to the program, UC states that the physicians are "responsible for the day-to-day activities of the Residents," and that its expectation is the physicians will provide the residents with "a supervised direct patient care experience" and include the residents in "teaching rounds and conferences presented by the attending staff." (2008 Program Letter of Agreement, 1.) In addition, UC stipulates that at the end of each residents' two-month rotation, one of the participating physicians must complete a written evaluation of the residents' performance, to be returned to the university program director. (2008 Program Letter of Agreement, 2.) The letter also states that "[a]ll parties recognize that the program must be in full compliance" with all "applicable accreditation requirements," such as "ACGME duty hour regulations." (2008 Program Letter of Agreement, 1.)

{¶18} Attached to the agreement letter, UC provides documents for the participating physicians to use when training a resident. These documents pertain to different organs and bodily systems, such as "Alimentary Tract and Digestive System" and "Liver, Biliary Tract and Pancreas," and list the resident's objectives for that area of the body, such as gaining the ability to "[d]emonstrate knowledge of the anatomy, physiology, and pathophysiology of the liver, biliary tract, and pancreas." (2008 Program Letter of Agreement, Appendix A, 12.)

{¶19} Based on the resident training program agreement, the Court of Claims found UC and Holzer Clinic had an employment contract, which applied to Dr. Canady individually since he was a shareholder and owner in the clinic. On appeal, UC asserts that the residency program agreement between UC and Holzer Clinic should not be "stretch[ed]" into an employment contract. (UC's Brief, 7.) In response, Dr. Canady adopts the Court of Claims' reasoning and argues he has an employment contract with the state because "there is a longstanding contractual relationship between [UC] and the Holzer Clinic, in which Dr. Canady is an owner and shareholder, governing the rotation of general surgery residents from [UC] to Holzer." (Dr. Canady's Brief, 11-12.)

{¶20} Even assuming, arguendo, that the arrangement between UC and Holzer Clinic was contractual, and that Dr. Canady was a party to that arrangement in his capacity as a shareholder and partial owner of the clinic, a contractual arrangement

"d[oes] not necessarily equate to a contract of employment." *Phillips* at ¶ 12. *See also Engel I* at ¶ 11 (finding first *Engel I* factor not met because "there was no contract *of employment*, written or oral"). (Emphasis added.) Generally, in a contract creating an employment relationship, "the employer agrees to pay the employee at an agreed rate," and "the employee agrees to perform work under the direction and control of the employer." *Lake Land Emp. Group of Akron, LLC v. Columber,* 101 Ohio St.3d 242, 2004-Ohio-786, ¶ 17 (discussing the inherently contractual nature of at-will employment). Yet, the record shows Holzer Clinic's arrangement with UC does not create a relationship which conforms to this basic structure.

{¶21} For present purposes, that is, for any established contractual relationship between the two entities to support a finding that Dr. Canady is a state employee, UC must be the employer in this scenario. However, UC did not compensate Holzer Clinic for the clinic's participation in the resident program. On the contrary, Holzer Clinic paid UC "for services that the residents provided" during their rotations at the clinic. (Tr. 62-63.) For instance, Holzer Clinic paid UC a daily rate of $231.78 for Dr. Campion during his eight-week rotation. This payment arrangement does not support the Court of Claims" finding that the resident program agreement creates an employment contract establishing Holzer Clinic as UC's employee.

{¶22} Furthermore, nothing in the record suggests Holzer Clinic consented to operate "under the direction and control" of UC when it entered into an agreement to help train UC residents, and the parties' resulting relationship lacks any of the common indicators of control. *Lake Land* at ¶ 17. For instance, UC was not entitled to information regarding clinic operations, it did not have a right to make decisions regarding finances, personnel, or patient care, it could not " 'supervise and second-guess the activities' " of Holzer Clinic staff, it did not provide materials or facilities, and it did not set clinic policy or dictate clinic rules and regulations. *Albain v. Flower Hosp.*, 50 Ohio St.3d 251, 259 (1990), quoting *Hendrickson v. Hodkin*, 250 A.D. 619, 621 (N.Y.1937) (Lazansky, J., dissenting), reversed, 276 N.Y. 252 (1937). *See also Hasch v. Vale*, 5th Dist. No. 2001CA00361, 2002-Ohio-3092, citing Ohio Adm.Code 4141-3-05 (setting forth the 20 "factors or elements" identified by "the common law rules" as "an aid to determining

whether there is sufficient direction or control present").  Additionally, in analyzing the matter sub judice pursuant to *Engel I's* second factor infra, we examine in detail whether the resident training arrangement conferred upon UC the right to control work done by the clinic's participating physicians, and find it did not.

{¶23}  Thus, Holzer Clinic's resident training agreement with UC did not create an employment contract between the two entities, or between UC and Dr. Canady based on the latter's position as a shareholder and partial owner of Holzer Clinic.

{¶24}  The only other possible evidence of an employment contract between Dr. Canady and UC is a letter discussing his personal appointment to a volunteer assistant professor position in the UC Department of Surgery, an appointment he received as a member of the Holzer Clinic "Surgical Teaching Faculty" mentioned in the Program Letter of Agreement.  (2008 Program Letter of Agreement, 1.)  The September 12, 2007 letter from UC College of Medicine Dean David Stern, M.D., and Senior Vice President Jane Henney, M.D., to UC Department of Surgery Interim Chairman Michael Nussbaum, M.D., states, in full, "I approve the recommendation to reappoint and promote Michael Canady, M.D., to the rank of Volunteer Assistant Professor in the Department of Surgery effective September 1, 2007 through August 31, 2010. By sending a copy of this letter to your business office, we are advising them to process the necessary paperwork to complete this action."  (Hearing exhibit J.)  On review, nothing in the record suggests UC intended the letter as a communication with Dr. Canady, much less a contract for employment. *Compare Potavin v. Univ. Med. Ctr.*, 10th Dist. No. 00AP-715 (Apr. 19, 2001) (finding an appointment letter could "be characterized as a contract" between a university and a practitioner-volunteer clinical instructor where the letter from the university dean to the practitioner, "stated what 'conditions, responsibilities and opportunities' [the practitioner] would have if she accepted the position," and required her "to sign the letter if she accepted the conditions provided").

{¶25}  Moreover, Poe and UC assert this letter is "just like the ones in *Engel* [*I*], that were held to not be * * * contracts." (UC's Brief, 6-7.)  In *Engel I,* the alleged employee presented two letters, one from 1995 and one from 2005, that he "received from the College of Medicine stat[ing] that the College of Medicine had approved his

"appointment" to the volunteer faculty at the rank of clinical assistant professor."  *Id.* at ¶ 18.  The alleged employee asserted the letters proved an employment contract existed between himself and the college of medicine.  *Id.* at ¶ 11.  The Supreme Court rejected this argument, holding that the letter "confirm[ed] Dr. Skoskiewicz's status as a volunteer clinical instructor," but "d[id] not show that Dr. Skoskiewicz was hired, appointed, or credentialed by the College of Medicine."  *Id.*

{¶26}  Dr. Canady attempts to distinguish *Engel I* by arguing "[u]nlike the very informal student clerkships involved in *Engel* [*I*], there is a specific and detailed contractual relationship between [UC] and Holzer." (Dr. Canady's Brief, 26.)  Yet, nothing in the *Engel* decisions from the appellate court or Supreme Court suggests the subject "apprenticeship program," which allowed residents to both "observe and assist local practitioners," was particularly informal.  *Engel v. Univ. of Toledo College of Medicine,* 184 Ohio App.3d 669, 2009-Ohio-3957, ¶ 5 (10th Dist.) ("*Engel II*"). In fact, the 2005 appointment letter specifically provided that, "[a]s a condition of appointment," the alleged employee was "subject to the [Medical College of Ohio] Faculty Rules and Regulations, and Medical College of Ohio policies and procedures."  *Engel I* at ¶ 13. Ultimately, the purpose and operative phrasing in the appointment letters is substantively the same, and we are guided by the Supreme Court's disposition of a similar claim based on similar letters.  Accordingly, the appointment letter provided by Dr. Canady serves to confirm his status as a volunteer clinical professor, but does not establish Dr. Canady had an employment contract with UC.

{¶27}  For these reasons, the evidence does not support the trial court's finding that Dr. Canady had an employment contract with the state.

### 2. Control

{¶28} The Court of Claims, having determined Dr. Canady and UC had an employment contract, also found the state had control over Dr. Canady's actions because the "contract between the parties required Dr. Canady to provide residents with direct patient care training, teaching rounds, and faculty-conducted conferences."  (Sept. 27, 2012 Judgment Entry, 6.)  On appeal, Poe and UC challenge the Court of Claims' finding, arguing that while the resident training agreement "describe[s] what is expected of the

residents and what goals and objections they are to meet," it "do[es] not set forth any 'manner and means' of the doctor's (Dr. Canady's) performance." (UC's Brief, 8.) In response, Dr. Canady adopts the Court of Claims' reasoning and asserts UC "controlled the actions of Dr. Canady as a faculty member teaching general surgery residents." (Dr. Canady's Brief, 24.)

{¶29} "[T]he right of control in the performance of work and the detailed manner in which the work is done" is the "fundamental distinguishing element" of an employment relationship. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 11th Dist. No. 93-A-1787 (Mar. 25, 1994), citing *Bd. of Edn. of City School Dist. of City of Cincinnati v. Rhodes*, 109 Ohio App. 415, 429 (10th Dist.1959); *Phillips* at ¶ 13, citing *Reid* at 751 (applying common law agency analysis of control). In determining "who has the right to control * * * [t]he factors to be considered include, but are certainly not limited to, such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts." *Bostic v. Connor,* 37 Ohio St.3d 144, 146 (1988).

{¶30} Here, the evidence does not indicate that UC had a right to control the manner and means by which Dr. Canady practiced medicine and performed surgeries. Although UC sets forth its "objectives" and "require[ments]" for the resident training provided by participating physicians, nothing in the record suggests UC has the right to enforce those objectives and requirements by interfering with Dr. Canady's medical discretion, controlling his performance as a surgeon, or otherwise dictating how he treats patients. (Dr. Canady's Brief, 24-25.) *See Bostic* at 146 (holding "[g]enerally, where the evidence is not in conflict or the facts are admitted, the question of whether a person is an employee or an independent contractor is a matter of law to be decided by the court").

{¶31} To this point, at the immunity hearing, Dr. Canady acknowledged that UC generally "do[es] [not] oversee [his] practice." (Tr. 42.) Dr. Canady admitted that UC did not have any input on basic matters such as his work schedule or "which types of

surgeries" to perform.  (Tr. 42.)  Likewise, UC did not provide Dr. Canady with office space or select his staff.

{¶32}  Regarding Dr. Canady's patients, Dr. Canady testified that the patients he sees at Holzer are considered his private patients; UC did not assign patients to Dr. Canady or tell Dr. Canady which patients to see.  UC did not tell Dr. Canady how much to charge patients, collect any of the fees generated by his practice, or otherwise "have any part in any of the billing for any * * * patients or any of their hospitalization stays."  (Tr. 42-43.)

{¶33}  As to matters involving Dr. Canady's compensation and benefits, Dr. Canady acknowledges that all of his compensation for his work at the clinic comes from Holzer Clinic, and he does not receive a paycheck or "any form of financial compensation" from "UC or any private entity associated with UC."  (Tr. 44-45, 45-46.)  Likewise, he has never received a W-2 from UC.  Dr. Canady also testified that UC does not provide his medical malpractice insurance, nor does he "pay into any insurance plans sponsored by University of Cincinnati." (Tr. 45.)  Dr. Canady was not "provided any benefits" from UC and he did not contribute to any state funded or participatory retirement plans through UC. (Tr. 46.)

{¶34}  Dr. Canady does not argue that UC had any control over his surgical performance or medical practice; nevertheless, he contends UC has the right to control his work because "the state controlled Dr. Canady's actions as they pertained to the supervision and education of the general surgery residents who rotated at Holzer Clinic." (Dr. Canady's Brief, 24.) However, the record demonstrates that, although UC provided the policies, procedures, goals and objectives for the residency program, the program's actual implementation required Dr. Canady, in his capacity as an autonomous practitioner and general surgeon, to effectuate those guidelines as he saw fit pursuant to his professional discretion.

{¶35}  For instance, while UC tells Holzer "the types and general areas of surgical treatment that the University * * * would like for [participating physicians] to help their residents experience," Dr. Canady acknowledged that the "specifics of what we are able to give them depends on the patient mix that we have during the rotation that they have,"

which is controlled by Dr. Canady and his colleagues when they select and schedule their patients. (Tr. 50.) In addition, although Dr. Canady testified he will try to give residents added experience in UC requested areas, he also admitted he has discretion over how much the resident actually gets to participate in the procedures, and he will decide whether to allow a resident to perform some of a given surgery based on whether he "perceive[s] after a few cases that the surgical resident has skills that would allow them to, in a reasonably expeditious way." (Tr. 37.) Furthermore, Dr. Canady acknowledged "[t]here's not a mandated ongoing dialogue" with the university during the course of a resident's two-month rotation; instead, the university judges the resident's performance during his or her rotation based on the participating physician's written evaluation. (Tr. 35.)

{¶36} Thus, while Dr. Canady accepted input from UC on matters related to the residency program, the record clearly shows Dr. Canady retained control over the manner and means by which he practiced medicine, even in relation to the program.

{¶37} As a final matter, Dr. Canady suggests that the simple fact that UC granted him a volunteer assistant professor appointment, and could revoke the same, proves UC had the right to control him. As *Engel I* demonstrates, however, the mere granting of a volunteer clinical faculty position does not automatically confer upon UC a level of control indicating an employment relationship. *Engel I* (holding a practitioner was not a state employee under R.C. 109.36(A), even though he was a volunteer clinical instructor of a state university). *See also Phillips* at ¶ 13 (finding university did not control doctor, even though it could revoke her privileges to practice at the university hospital "which were contingent on her ability to secure a faculty appointment, maintain specific credentials, and contribute to the academic mission of the department," since doctor's "ability to practice medicine" was not influenced by the university); *Wojewski v. Rapid City Regional Hosp., Inc.*, 450 F.3d 338, 344 (8th Cir.2006) (holding university's ability to revoke hospital privileges did not constitute sufficient degree of control where physician "performed highly skilled surgical work, leased his own office space, scheduled his operating room time, employed and paid his own staff, billed his patients directly, did not receive any social security or other benefits from [the hospital], and did not receive a form

W-2 or 1099"); *Schelling v. Humphrey*, 123 Ohio St.3d 387, 2009-Ohio-4175, ¶ 14, *overruled in part on other grounds Clark v. Southview Hosp. & Family Health Ctr.*, 68 Ohio St.3d 435 (1994) (finding hospital's ability to dictate policies and procedures regarding patient care and to grant and revoke staff privileges did not constitute a sufficient degree of control to establish an employment relationship because only licensed physicians, not hospitals, are permitted to practice medicine or surgery in this state and, consequently, the hospital had to allow physician to provide patient care services independently).

{¶38} Consequently, UC did not possess a sufficient degree of control over the manner and means of Dr. Canady's medical practice to suggest he is employed by the state.

### 3. Symbiosis

{¶39} The Court of Claims found UC and Holzer Clinic had a symbiotic relationship because they "contracted to educate residents on various aspects of general surgery." (Sept. 27, 2012 Judgement Entry, 8.) On appeal, appellants assert that the Court of Claims "completely misconstrued the *Engel I* holding in regard [to] when it discusses the 'symbiotic relationship' defined in the case of *Potavin*." (UC's Brief, 10.)

{¶40} In setting forth its third factor, the *Engel I* court noted that the fact that the state entity "did not directly pay [the alleged employee] does not necessarily mean that he is not a state employee." *Id.* at ¶ 15. However, "[a]lthough courts have found a physician to be an employee of a state university even where he or she is not directly paid by the university, this has only been so where a 'symbiotic relationship' exists between the university and the physician's practice plan." *Phillips* at ¶ 15, citing *Engel I* at ¶ 15; *Potavin*. To illustrate its meaning when allowing for a "symbiotic relationship" to substitute for direct payment, the *Engel I* court cites this court's 2001 case, *Potavin*. *Engel I* at ¶ 15. In *Potavin*, this court held that a volunteer clinic instructor for the University of Cincinnati College of Medicine's OB/GYN department who was compensated solely by a private practice group was a state employee for purposes of R.C. 9.86 immunity because the record showed the university had a "high degree" of control over the private practice group. *Id.* In fact, we held that the practice group and the

university "functioned as one entity" where compensation of practice group employees was subject to the approval of the dean of the college of medicine, the practice plan contributed profits from its medical services billings, which accounted for a substantial portion of the OB/GYN department's budgetary funds, and the dean had "the authority and the power" to unilaterally transfer funds from the practice group to the university. *Id.* Furthermore, as the University of Cincinnati's College of Medicine's OB/GYN department actually "created" the private practice group pursuant to university approval, the director of the OB/GYN department testified that the practice plan "wouldn't exist without the University of Cincinnati because it couldn't exist." *Id.* Based on these considerations, the *Potavin* court determined that the university "intended to compensate" the alleged employee "by funds collected and distributed by [the private practice group]." *Id. Compare Engel I* at ¶ 15 (finding "no such symbiotic relationship exist[ed]" where the state entity did not pay the alleged employee and a private hospital, "which is not connected with the college, did").

{¶41} Thus *Potavin*, and by extension *Engel I*, indicates our symbiotic relationship inquiry should consider whether UC and Holzer Clinic were so intertwined as to suggest Dr. Canady's direct payment from the clinic can be viewed as payment from UC as well. Yet, the Court of Claims simply revisited the two entities' resident training arrangement and found a symbiotic relationship existed since the entities both received benefits and incurred obligations under that arrangement. (Sept. 27, 2012 Judgment Entry, 8.)

{¶42} On review, the record provides no indication that Holzer Clinic functioned as one entity with UC; unlike the college of medicine in *Potavin*, UC did not dictate clinic employees' compensation, share in billings revenue, or provide malpractice insurance coverage. What is more, though a resident on rotation clearly provides assistance to clinic physicians by completing tasks requiring less skill and experience, nothing in the record suggests Holzer Clinic would fail to exist without its relationship with UC. (*See* Tr. 30-31.) Accordingly, there is no symbiotic relationship between Holzer Clinic and UC.

{¶43} As there was no contract of employment between UC and Dr. Canady, the state did not have control over Dr. Canady's actions, and there was no symbiotic

relationship between the state and the Holzer Clinic, the evidence indicates Dr. Canady was not "employed by the state" pursuant to R.C. 109.36(A)(1)(a). Because Dr. Canady was not a state employee at the time of Malone's treatment, our analysis is completed and Dr. Canady is not entitled to R.C. 9.86 immunity. Both Poe and UC's assignments of error are sustained.

## IV. DISPOSITION

{¶44} Having sustained Poe and UC's assignments of error, we reverse the judgment of the Court of Claims of Ohio.

*Judgment reversed.*

KLATT, P.J., and McCORMAC, J., concur.

McCORMAC, J., retired, formerly of the Tenth Appellate
District, assigned to active duty under authority of the Ohio
Constitution, Article IV, Section 6(C).

_____