[Cite as *Marotto v. Ohio State Univ. Med. Ctr.*, 2014-Ohio-4549.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Deborah Marotto et al., | : | |
| Plaintiffs-Appellees, | : | |
| v. | : | No. 14AP-303 |
| | | (Ct. of Cl. No. 2011-02590) |
| The Ohio State University Medical Center, | : | |
| | : | (REGULAR CALENDAR) |
| Defendant-Appellee, | : | |
| | : | |
| (David Bell, M.D., | : | |
| Defendant-Appellant). | : | |
| | : | |

---

D E C I S I O N

Rendered on October 14, 2014

---

*Michael DeWine,* Attorney General, and *Karl W. Schedler,* for appellee OSU Medical Center.

*The Triona Firm, James P. Triona,* and *Paul J. Vollman,* for appellant David Bell, M.D.

---

APPEAL from the Court of Claims of Ohio

CONNOR, J.

{¶ 1} Defendant-appellant, David Bell, M.D., appeals from a judgment of the Court of Claims of Ohio, finding that he was not entitled to state employee immunity under R.C. 2743.02(F) and 9.86. Because Dr. Bell is not an officer or employee of the state, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On February 15, 2011, Deborah Marotto, Howie Marotto and Mario Marotto filed a complaint against The Ohio State University Medical Center ("OSUMC"), in the Court of Claims seeking damages related to injuries suffered as a result of Mario's birth at OSUMC on January 27, 2007. The Marottos also filed an action in the Franklin County Court of Common Pleas against Dr. Bell, Kingsdale Gynecological Associates, Inc. ("Kingsdale"), MaternOhio Clinical Associates, Inc., and two residents. Dr. Bell responded that R.C. 9.86 and 2743.02 provided him with immunity since he was a state employee, as he was an OSUMC faculty member instructing the OSUMC residents who assisted him with the delivery of Mario.

{¶ 3} Dr. Bell is a physician practicing in the field of obstetrics and gynecology ("Ob/Gyn"). Kingsdale is Dr. Bell's employer. Dr. Bell's office is located at Kingsdale; Kingsdale pays for Dr. Bell's malpractice insurance; Kingsdale schedules patients for Dr. Bell; Kingsdale bills patients for Dr. Bell's medical services, and collects on those bills. In 2007, Dr. Bell was also a member of the faculty at The Ohio State University ("OSU"). The Bylaws of the Medical Staff of The Ohio State University Hospitals ("bylaws") require that "[a]ll members of the medical staff of the Ohio state university hospitals shall * * * be members of the faculty of the Ohio state university." (Plaintiff's exhibit A, Bylaws § 3335-43-04(A)(2).)

{¶ 4} Dr. Bell was a member of the courtesy medical staff at OSUMC, also known as the auxiliary faculty. The courtesy medical staff is generally comprised of "[c]ommunity physicians who * * * spend a very small percent of their overall time [at OSUMC]." (Tr. 149.) As a member of the courtesy medical staff, Dr. Bell possessed the ability to admit his private patients to OSUMC. In exchange, Dr. Bell agreed to supervise residents whenever he admitted a patient to OSUMC. Dr. Bell received no financial compensation from OSUMC pursuant to this arrangement, but he did receive access to continuing medical education courses and to the health sciences library at OSU.

{¶ 5} Mrs. Marotto was a patient of Dr. Carol Greco, one of Dr. Bell's colleagues at Kingsdale. Mrs. Marotto received all of her prenatal care from Dr. Greco at Kingsdale. When Mrs. Marotto went into labor, she went to OSUMC to deliver her child. Kingsdale has a call schedule which assigns one of the several physicians who work at Kingsdale to

be "on call" during the nighttime and weekend hours. Dr. Bell was the Kingsdale physician on the call schedule on the evening that Mrs. Marotto went into labor. Dr. Bell agreed that, "[b]ut for the fact that [Mrs. Marotto] was to deliver at a time when the call schedule was in force, Dr. Greco would have probably delivered this baby." (Tr. 243.)

{¶ 6} The Court of Claims conducted a hearing on December 9, 2011, pursuant to R.C. 2743.02(F), to determine whether Dr. Bell was entitled to state immunity. At that hearing, Dr. Bell's deposition was admitted into evidence, and the Marottos and OSUMC stipulated that Dr. Bell was not an officer or employee of OSUMC. The Court of Claims issued an entry denying Dr. Bell immunity. Dr. Bell appealed the Court of Claims entry to this court. On December 27, 2012, this court issued a decision finding that the Court of Claims had denied Dr. Bell his opportunity to participate in the hearing, as required by R.C. 2743.02. *Marotto v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-27, 2012-Ohio-6158, ¶ 19 ("*Marotto I*"). Accordingly, we reversed and remanded the case for the Court of Claims to "hold a hearing, admit evidence, and consider the evidence to determine Dr. Bell's immunity." *Id.* at ¶ 19. The Court of Claims held the required hearing on July 25, 2013.

{¶ 7} On January 9, 2014, the magistrate issued a decision finding that Dr. Bell was not entitled to immunity. The magistrate noted that Dr. Bell held a "non-paid auxiliary faculty position, whereby his teaching obligations were fulfilled by allowing residents to participate during the care of his patients who were admitted to OSUMC." (Magistrate's Decision, 3.) The magistrate concluded that Dr. Bell was not an OSU employee, as he did not have a contract of employment with OSU, OSU did not have control over Dr. Bell's medical practice, OSU did not compensate Dr. Bell monetarily, and there was no symbiotic relationship between OSUMC and Kingsdale. The magistrate also concluded that Dr. Bell was not rendering medical services pursuant to a personal services contract with OSU at the time the injury occurred.

{¶ 8} Dr. Bell timely filed objections to the magistrate's decision. On March 19, 2014, the Court of Claims issued a decision overruling Dr. Bell's objections and adopting the magistrate's decision as its own.

## II. ASSIGNMENTS OF ERROR

{¶ 9}   Dr. Bell appeals, assigning the following errors:

> [I.] The Court of Claims Erred When it Held David Bell MD was not an Officer or Employee of Ohio under RC§109.36(A)(1)(b).
>
> [II.] The Court of Claims Erred When it Held David Bell MD was not an Officer or Employee of Ohio under RC§109.36(A)(1)(a).

{¶ 10} As Dr. Bell's assignments of error are related, we address them together. Dr. Bell's assignments of error collectively assert that the Court of Claims erred in its conclusion that Dr. Bell was not an officer or employee of Ohio.

{¶ 11} R.C. 9.86 discusses the civil liability of state officers and employees. It provides that "no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties." A state officer or employee may still be subject to personal liability, however, if their "actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 9.86. "R.C. 9.86 is inclusive and makes no exception for persons who may simultaneously have other employment interests. It provides immunity for all state employees as long as they are acting within the scope of their employment when the injury occurs." *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208, ¶ 25.

{¶ 12} R.C. 2743.02(F) sets forth the procedure for determining the immunity R.C. 9.86 provides and states, in part:

> A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims that has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code

and whether the courts of common pleas have jurisdiction over the civil action.

{¶ 13} " '[W]hether a doctor is entitled to personal immunity from liability under R.C. 9.86 involves a question of law, an issue over which the Court of Claims has exclusive, original jurisdiction.' " *Poe v. Univ. of* Cincinnati, 10th Dist. No. 12AP-929, 2013-Ohio-5451, ¶ 7, quoting *Marotto I* at ¶ 9, citing *Nease v. Med. College Hosps.*, 64 Ohio St.3d 396, 400 (1992). "If the Court of Claims determines the employee is immune from liability, then the claimant in the underlying action must assert his or her claims against the state and the state shall be liable for the employee's deeds or omissions. R.C. 2743.02(A)(2)." *Poe* at ¶ 7.

{¶ 14} When determining whether an individual is entitled to immunity under R.C. 9.86, the Court of Claims analysis has two parts. First, the court must determine whether the individual was a state officer or employee, and second, the court must determine whether the individual was acting within the scope of their employment when the cause of action arose. *Theobald* at ¶ 14. " 'If the court determines that the practitioner is not a state employee, the analysis is completed and R.C. 9.86 does not apply.' " *Phillips v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-414, 2013-Ohio-464, ¶ 7, quoting *Theobald* at ¶ 30.

{¶ 15} R.C. 109.36 defines who may be considered an officer or employee of the state. It provides, in relevant part, as follows:

> (A)(1) "Officer or employee" means any of the following:
>
> (a) A person who, at the time a cause of action against the person arises, is serving in an elected or appointed office or position with the state or is employed by the state.
>
> (b) A person that, at the time a cause of action against the person, partnership, or corporation arises, is rendering medical, nursing, dental, podiatric, optometric, physical therapeutic, psychiatric, or psychological services pursuant to a personal services contract or purchased service contract with a department, agency, or institution of the state.

{¶ 16} Dr. Bell asserts that he is both an employee of the state, under R.C. 109.36(A)(1)(a), and that he was rendering medical services pursuant to a personal

services contract with a state institution, under R.C. 109.36(A)(1)(b), when the injury at issue occurred.

### A. R.C. 109.36(A)(1)(a)

{¶ 17} Dr. Bell's second assignment of error asserts that the Court of Claims erred in finding that he was not a state officer or employee under R.C. 109.36(A)(1)(a). R.C. 109.36(A)(1)(a) defines a state employee as a person employed by the state. This definition is " ' "completely circular and explains nothing." ' " *Phillips* at ¶ 9, quoting *Bryson v. Middlefield Volunteer Fire Dept., Inc.*, 656 F.3d 348, 353 (6th Cir.2011), quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). "In cases where federal statutes use but do not helpfully define the term 'employee,' the United States Supreme Court instructs courts to rely on common law agency principles." *Poe* at ¶ 10. Accordingly, when determining whether a hired party is an employee, a court must consider " 'the hiring party's right to control the manner and means by which the product is accomplished.' " *Darden* at 323, quoting *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989). *Darden* further stated that other factors relevant to the inquiry include:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden* at 323-24, quoting *Reid* at 751-52.

{¶ 18} In *Engel v. Univ. of Toledo College of Medicine*, 130 Ohio St.3d 263, 2011-Ohio-3375, the Supreme Court of Ohio considered whether a private physician, who was also an unpaid volunteer faculty member at a state university, was an employee of the state under R.C. 109.36(A)(1)(a). The *Engel* court did not adopt a formal test but found three factors to be "helpful" in the employment analysis. *Id.* at ¶ 10. The court emphasized that "other factors may be considered and stress[ed] that in most circumstances a

person's status as a state employee is factually indisputable." *Id.* The three factors which the *Engle* court identified were: (1) whether the state and the alleged employee had a "[c]ontractual relationship;" (2) whether the state had control over the alleged employee's actions; and (3) whether the state, or a private entity with a "symbiotic relationship" with the state, paid the alleged employee for his services. *Id.* at ¶ 11-15.

### 1. Contract

{¶ 19} Dr. Bell contends that his application to become a member of the courtesy medical staff, the letter appointing him to the courtesy medical staff, and the bylaws form a contract. The letter appointing Dr. Bell to the medical staff states that the Credentials Committee approved Dr. Bell's "application for reappointment to Courtesy staff in the Department of Obstetrics and Gynecology." (Defendant's exhibit No. 2.)

{¶ 20} The bylaws expressly divide the medical staff at OSUMC into four categories: honorary, attending, courtesy, and limited. The honorary staff is composed of "those individuals who hold emeritus faculty status." (Plaintiff's exhibit A, Bylaws § 3335-43-07(A)(1).) The limited staff are the residents, i.e., those doctors "who are accepted in good standing by a program director into post-doctoral graduate medical education program." (Plaintiff's exhibit A, Bylaws § 3335-43-07(D)(1).) The attending medical staff are "those faculty members * * * to whom clinical teaching responsibilities are assigned in the Ohio state university hospitals." (Plaintiff's exhibit A, Bylaws § 3335-43-07(B)(1).) The attending medical staff may admit patients to OSUMC, exercise clinical privileges, vote on all matters presented at general and special meetings of the medical staff, and hold office in the medical staff organization.

{¶ 21} The courtesy medical staff are "those faculty members * * * who do not qualify for attending medical staff appointment." (Plaintiff's exhibit A, Bylaws § 3335-43-07(C)(1).) The courtesy staff may "[a]dmit patients that complement the clinical teaching program," but if beds at the hospital are in short supply, "patient admissions of courtesy medical staff shall be subordinate to those of attending medical staff." (Plaintiff's exhibit A, Bylaws § 3335-43-07(C)(2).) Courtesy medical staff may exercise the clinical privileges which are granted to them and attend meetings of the department of which they are a member, but they may only vote and hold office on those committees "reserved for the

representative of the courtesy medical staff." (Plaintiff's exhibit A, Bylaws § 3335-43-07(C)(2).)

{¶ 22} Members of both the attending and courtesy medical staff have the responsibility to retain competency in their field of expertise, participate in quality evaluations and monitoring activities as required by the medical staff, and satisfy the applicable requirements for attendance at staff and departmental meetings. They are also obligated to "[s]upervise members of the limited staff in the provision of patient care in accordance with accreditation standards and policies and procedures of approved clinical training programs" and "to authorize each member of the limited staff to perform only those services which the limited staff member is competent to perform under supervision." (Plaintiff's exhibit A, Bylaws § 3335-43-07(B)(3).)

{¶ 23} Assuming that these documents do form a contract, they do not form a contract of employment. *See Phillips* at ¶ 12 (noting that, even if the doctor's "arrangement with OSUMC was *contractual*, it did not necessarily equate to a contract of *employment*"). "Generally, in a contract creating an employment relationship, 'the employer agrees to pay the employee at an agreed rate,' and 'the employee agrees to perform wok under the direction and control of the employer.' " *Poe* at ¶ 20, quoting *Lake Land Emp. Group of Akron, LLC v. Columber*, 101 Ohio St.3d 242, 2004-Ohio-786, ¶ 17. Dr. Bell's arrangement with OSUMC does not conform to this basic structure.

### 2. Control

{¶ 24} " '[T]he right of control in the performance of work and the detailed manner in which the work is done' is the 'fundamental distinguishing element' of an employment relationship." *Poe* at ¶ 29, quoting *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 11th Dist. No. 93-A1787 (Mar. 25, 1994). Dr. Bell asserts that, "[w]hile OSU does not control their offices, OSU exerts tremendous control over the [courtesy staff] physicians while they are rendering care in the state medical center." (Appellant's brief, 28.) The record evidence, however, does not indicate that OSU had control over Dr. Bell's practice of medicine or over Dr. Bell's supervision of residents.

{¶ 25} OSU did not determine Dr. Bell's schedule, schedule Dr. Bell for certain shifts, or require that he admit a certain percentage of his patients to OSUMC. OSU did not dictate which patients Dr. Bell saw in his private office. Dr. Bell did have to make

"24 patient encounters in a two-year period" to keep his faculty appointment, "but [OSU] accept[ed] activity reports from other hospitals if signed off by their leadership." (Tr. 150.) Andrew Thomas, M.D., the associate medical director for OSUMC and associate dean of graduate medical education, explained that OSU accepted that "outside information as an attestation that [members of the courtesy staff were] clinically active" because "there [was] no minimum requirement [for their activity] at the medical center." (Tr. 150.) Unlike the full-time attending medical staff, Dr. Bell did not need permission to practice outside of OSUMC. Dr. Bell also did not have to engage in didactic teaching or research. Dr. Bell was not obligated to treat OSU clinic patients or indigent patients. The residents did not have to evaluate Dr. Bell, but the residents were expected to evaluate the full-time faculty members. OSU did not bill the Marottos for Dr. Bell's medical services during Mario's birth. OSU did not provide Dr. Bell with malpractice insurance. Dr. Bell admitted that, "as far as numbers of deliveries and procedures, no, there's no control" that OSU had over him. (Tr. 251.)

{¶ 26} Nevertheless, Dr. Bell asserts that he was an OSU employee in 2007, as the bylaws required him "to supervise residents as a condition precedent for gaining privileges" to admit patients to OSUMC. (Appellant's brief, 27.) In *Phillips,* the defendant doctor, Dr. Greco,[1] claimed that "OSUMC possessed the requisite control over her by virtue of its ability to revoke her privileges to practice at the hospital, which were contingent on her ability to secure a faculty appointment, maintain specific credentials, and contribute to the academic mission of the department." *Phillips* at ¶ 13. We noted that the "mere granting of hospital privileges to a physician does not automatically confer employee status." *Id.* at ¶ 12. *See also Costell v. Toledo Hosp.*, 98 Ohio App.3d 586, 593 (6th Dist.1994) (noting that "Ohio courts have consistently held that the granting of hospital privileges to a physician is not alone sufficient to show the creation of a direct actual agency relationship between the doctor and the hospital"). Even though "OSU had the right to review and potentially revoke Dr. Greco's privileges to practice at OSUMC," as OSU did not dictate Dr. Greco's schedule, require her to perform the clinical duties of full-

---

[1] The Dr. Greco in *Phillips* was the same Dr. Greco who was Mrs. Marotto's primary physician herein. In *Phillips,* we found that Dr. Greco was not a state employee under R.C. 109.36(A)(1)(a). Notably, Dr. Bell agreed at the July 25, 2013 hearing that his "relationship with OSU in 2007 was the same as Dr. Greco's status in 2007." (Tr. 244.)

time faculty members, or pay her, we could not agree "that the privileges granted by OSUMC represented a sufficient degree of control over Dr. Greco's manner and means to practice." *Id.* at ¶ 14. Accordingly, that Dr. Bell had admitting privileges at OSUMC does not indicate that OSU possessed control over Dr. Bell's practice of medicine.

{¶ 27} Moreover, Dr. Bell does not explain how his obligation to supervise residents at OSUMC gave OSU control over his practice of medicine. In *Gharibshahi v. State*, 10th Dist. No. 13AP-844, 2014-Ohio-1529, the defendant doctor, Dr. Artman, who similarly held a courtesy medical staff appointment at OSUMC, alleged that "OSUMC possessed control over her because to keep her faculty appointment and privileges, she had to follow the bylaws, [and] supervise residents in accordance with ACGME standards." *Id.* at ¶ 17. We determined that, "[a]lthough Dr. Artman had an obligation to teach and supervise residents when she treated her patients at OSUMC, she point[ed] to no evidence that OSU controlled the details of her teaching or supervision." *Id.* at ¶ 18. Similarly, here, although the bylaws obligated Dr. Bell to supervise residents when he admitted a patient to OSUMC, Dr. Bell has pointed to no evidence which would indicate that OSU controlled his supervision of those residents. Rather, Dr. Bell retained discretion regarding how to treat his private patients and how to instruct the residents who assisted him with the care of his private patients at OSUMC. *Compare Poe* at ¶ 34 (finding that the university did not control Dr. Canady when he supervised residents pursuant to "the policies, procedures, goals and objectives for the residency program" established by the university, as the "program's actual implementation required Dr. Canady, in his capacity as an autonomous practitioner and general surgeon, to effectuate those [university] guidelines as he saw fit pursuant to his professional discretion").

{¶ 28} Dr. Bell asserts that, pursuant to his arrangement with OSUMC, "either he permitted OSU residents to scrub in and actually perform the surgeries; or he [would lose] his privileges" to admit patients to OSUMC. (Appellant's brief, 28.) However, Mark Landon, M.D., chairman of the Ob/Gyn department at OSU, stated that, although it was the university's "hope that [the courtesy staff] would involve residents" in their patient care at OSUMC, there were no "consequences if they failed to do so." (Defendant's exhibit No. 7, Landon Depo., 12.) Similarly, Dr. Thomas stated that he was "not familiar" with

any instance of a member of the courtesy staff being removed from the medical staff because they were failing to instruct residents. (Tr. 152.) Accordingly, it is questionable whether Dr. Bell would have actually lost his privileges at OSUMC if he had excluded a resident from his patient care. Regardless, as noted above, the mere granting of hospital privileges or the attendant possibility that those privileges could be revoked is insufficient to demonstrate employee status.

{¶ 29} Accordingly, we cannot agree that the privileges granted by OSUMC to Dr. Bell, or that Dr. Bell's obligation to supervise residents while at OSUMC, provided OSU with a sufficient degree of control over Dr. Bell's manner and means to practice so as to indicate an employee/employer relationship.

### 3. Payment

{¶ 30} Dr. Bell does not dispute that his courtesy medical staff position was without monetary compensation. Indeed, Dr. Bell did not receive a W-2 or 1099 statement from OSU in 2007, and Dr. Bell declared no income from OSU in 2007. Dr. Bell asserts that OSU provided him with compensation in the form of free continuing medical education classes and free access to the health sciences library. However, Dr. Bell presented no evidence regarding the value of those classes or the general cost to access the health sciences library.

{¶ 31} In *Phillips,* we found the lack of monetary compensation from OSUMC to Dr. Greco significant. We noted that, "[a]lthough courts have found a physician to be an employee of a state university even where he or she is not directly paid by the university, this has been so where a 'symbiotic relationship' exists between the university and the physician's practice plan." *Id.* at ¶ 15, citing *Engel* at ¶ 15. A symbiotic relationship exists between a university and a physician's practice plan when the two function as "one entity." *Potavin v. Univ. Med. Ctr.*, 10th Dist. No. 00AP-715 (Apr. 19, 2001). In *Phillips,* we observed that there was no evidence indicating that the Kingsdale practice plan "and OSUMC functioned as one entity." *Id.* at ¶ 16. *See also Poe* at ¶ 42.

{¶ 32} Similarly, here, there is no evidence of a symbiotic relationship between OSUMC and Dr. Bell's practice plan. Dr. Bell agreed at the July 2013 hearing that Kingsdale "was a totally separate and independent entity from Ohio State in January of 2007." (Tr. 237.) Accordingly, we conclude that OSU did not pay Dr. Bell for his services.

### 4. Other Factors

{¶ 33} Dr. Bell asserts that other factors indicate that he was an OSU employee. Dr. Bell contends that the "OSU OB/GYN Department relies heavily on Courtesy Staff such as Dr. Bell, to provide the necessary numbers of procedures for residents so OSUCOM can maintain its Accreditation with" the American Accreditation Council for Graduate Medical Education ("ACGME"). (Appellant's brief, 29.) Dr. Bell also notes that OSU's "business of 'educating residents' was being carried out under the roof of the principal's facility," which benefitted OSU. (Appellant's brief, 29.)

{¶ 34} Dr. Samuels explained that the ACGME accredits the OSU Ob/Gyn department, and that the ACGME delineates certain procedures that residents must perform during their residency. Dr. Samuels stated that the total amount of resident training by the courtesy medical staff in the Ob/Gyn department in 2007 "was no more than 20 percent and probably less," noting that in obstetrics that number "would be less than 10 percent," while in gynecology the number would "probably be closer to 15 percent." (Tr. 96.) Dr. Samuels further noted that "24/7 we have an attending, licensed physician, at least one" on duty at OSUMC who can supervise the residents on any given procedure they must perform. (Tr. 88.)

{¶ 35} Thus, while members of the courtesy medical staff may have assisted OSU by providing additional doctors to supervise the residents, the full-time paid faculty members provided the vast majority of resident supervision. In addition, the full-time paid faculty members provided the residents with both didactic teaching and clinical bedside instruction. In contrast, the members of the courtesy staff contributed only a small percentage to the overall education the residents received at OSUMC, as the courtesy staff merely supervised the residents at OSUMC. Dr. Bell fails to explain how the minimal, uncompensated instruction provided by him or any other member of the courtesy medical staff rendered such individuals OSU employees.

{¶ 36} Dr. Bell further notes that the courtesy staff benefited OSU "by bringing in extra money to the school since OSU bills Dr. Bell's patients for all facility charges on inpatient stays." (Appellant's brief, 29.) Although OSU did not bill the Marottos for Dr. Bell's medical services, it did bill the Marottos for the cost of their stay at OSUMC. Dr. Bell fails to explain how the fact that he may have brought additional money into OSUMC

indicates an employment relationship, as OSU did not provide him with any monetary compensation.

{¶ 37} We further note that OSU did not have the right to assign additional projects to Dr. Bell and that OSU had no control over when Dr. Bell came to OSUMC. Kingsdale, not OSU, provided Dr. Bell with his support staff, and OSU did not provide Dr. Bell with employee benefits such as medical or dental coverage. *See Darden* at 323-24. Based on our review of the factors from *Darden* and *Engel*, it is readily apparent that Dr. Bell was not an OSU employee when the injury at issue occurred.

{¶ 38} Dr. Bell asserts that he was "also serving in an appointed position with the State" under R.C. 109.36(A)(1)(a). (Appellant's brief, 30.) Dr. Bell does not explain or support this assertion. In *Engel,* the court noted that a public officer, under R.C. 109.36(A)(1)(a), " 'as distinguished from an employee, must possess some sovereign functions of government to be exercised by him for the benefit of the public either of an executive, legislative, or judicial character.' " *Engel* at ¶ 19, quoting *Newman v. Skinner*, 128 Ohio St. 325, 327 (1934). Dr. Bell possessed no "sovereign" function of an executive, legislative, or judicial character, and his duties were not similar to those of a public officer. Accordingly, Dr. Bell was not serving in an appointed office or position with the state. *See also Gharibshahi* at ¶ 33 (noting that, "[e]ven if we agreed Dr. Artman had a legal duty to supervise residents, that is not a sovereign function of an executive, legislative or judicial character or a duty of a level consonant with those of a public office").

{¶ 39} Based on the foregoing, we conclude that Dr. Bell failed to establish that he was an agent or employee of the state under R.C. 109.36(A)(1)(a). Accordingly, we overrule Dr. Bell's second assignment of error.

### B. R.C. 109.36(A)(1)(b)

{¶ 40} In Dr. Bell's first assignment of error, he asserts that the trial court erred in finding that he was not an officer or employee of the state under R.C. 109.36(A)(1)(b). As noted above, that statutory section defines an officer or employee of the state, in relevant part, as "[a] person that, at the time a cause of action against the person * * * arises, is rendering medical * * * services pursuant to a personal services contract * * * with a department, agency, or institution of the state." Dr. Bell states that he was operating

"under an express <u>written</u> contract with the OSU Medical Center," whereby he "agree[d] to supervise its residents at the state run facility; as a precondition for granting privileges." (Emphasis sic.) (Appellant's brief, 20.) Dr. Bell further asserts that the bylaws and the appointment letter form "a personal services contract to render medical services with a department, agency or institution of the State." (Appellant's brief, 22.)

{¶ 41} The "phrase 'personal services contract' is not defined by statute." *Smith v. Ohio State Univ. Hosps.*, 110 Ohio App.3d 412 (10th Dist.1996). In *Smith,* we noted that a personal services contract is "a contract 'in which the offeree is vested with discretion in accomplishing the assigned tasks because his skills, knowledge, experience and expertise are unique to the area and could not be duplicated by others not similarly qualified.' " *Smith* at 415-16, quoting *Yellow Cab of Cleveland, Inc. v. Greater Cleveland Regional Transit Auth.*, 72 Ohio App.3d 558, 563 (8th Dist.1991). In *Smith,* we observed that, "[r]educed to its essence, a personal services contract suggests a degree of control exercised by the purchaser over the services to be performed by a chosen individual or individuals"; whereas, a purchased services contract indicates, "as the name implies, a purchase of services without regard to the specific individual to provide the service." *Id.* at 416.

{¶ 42} Dr. Thomas explained that "intermittently" OSUMC would "use personal services contracts for locum tenens physicians, if we have an area that's understaffed," noting that such personal services contracts would always be in writing and signed by "whoever was providing funding for that person." (Tr. 151.) Dr. Thomas further stated that a personal services contract with OSUMC would be "separate from a faculty appointment." (Tr. 155.) Dr. Bell did not produce any contract separate from his faculty appointment and the bylaws to indicate that he had a personal services contract with OSU. Notably, when Dr. Bell was asked at the hearing if he had a personal services contract with OSU in January 2007, he said "I don't believe so." (Tr. 235.)

{¶ 43} In *Gharibshahi*, Dr. Artman, also a member of the courtesy medical staff, similarly argued that she was rendering medical services pursuant to a personal services contract with OSU. We noted that, even if Dr. Artman's arrangement with OSU pursuant to the bylaws "was contractual, she was not obligated to render medical services pursuant to that contract." *Id.* at ¶ 38. We observed that, "[u]nder her arrangement with

OSU, Dr. Artman did not have to provide medical services to [the child she delivered], his mother, or anyone else. At most, she had an obligation to render some type of supervisory or teaching services to residents when she elected to treat her own patients at OSUMC." *Id.* We also noted that Dr. Artman had presented "no legal authority for the position that supervision and teaching qualify as 'medical services' for purposes of R.C. 109.36(A)(1)(b) simply because they occur in a medical setting." *Id.*

{¶ 44} Our holding in *Gharibshahi* is directly applicable here. Although Dr. Bell may have had a contract with OSUMC, it was not a contract to render medical services. Dr. Bell's contract with OSU obligated him to supervise residents and to only permit the residents to perform services which the resident was competent to perform. R.C. 109.36(A)(1)(b) does not cover personal services contracts for supervision. Although Dr. Bell was rendering medical services at the time the injury at issue occurred, he was rendering those services to the Marottos pursuant to his employment contract with Kingsdale. Dr. Bell did not have a personal services contract with the state which obligated him to render medical services.

{¶ 45} Based on the foregoing, we overrule Dr. Bell's first assignment of error.

## III. DISPOSITION

{¶ 46} Having overruled both of Dr. Bell's assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

DORRIAN and O'GRADY, JJ., concur.

———————————