[Cite as *Gharibshahi v. State*, 2014-Ohio-1529.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Sooshyance Gharibshahi et al., | : | |
| Plaintiffs-Appellees, | : | |
| v. | : | No. 13AP-844 |
| | | (Ct. of Cl. No. 2011-08547) |
| State of Ohio, c/o Ohio Attorney General Mike DeWine et al., | : | |
| | : | (REGULAR CALENDAR) |
| Defendants-Appellees, | : | |
| | : | |
| [Sarah Artman, M.D., | : | |
| Appellant]. | : | |
| | : | |

D E C I S I O N

Rendered on April 10, 2014

*Nurenberg, Paris, Heller & McCarthy Co., L.P.A., Ellen M. McCarthy, William S. Jacobson* and *Brenda M. Johnson*, for plaintiffs-appellees.

*Michael DeWine*, Attorney General, and *Jeffrey L. Maloon*, for appellee Ohio State University Medical Center.

*The Triona Firm, James P. Triona* and *Paul J. Vollman*, for appellant.

APPEAL from the Court of Claims of Ohio

O'GRADY, J.

{¶ 1} Appellant, Sarah Artman, M.D. ("Dr. Artman"), appeals from a judgment of the Court of Claims of Ohio finding she was not entitled to immunity under R.C. 9.86 and 2743.02(F). For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2}   In June 2011, Sooshyance Gharibshahi, a minor, by and through his mother and next friend Newsha Kuhbanani, Newsha Kuhbanani, and Sharam Gharibshahi (collectively "plaintiffs") filed a complaint in the Court of Claims against the state of Ohio and The Ohio State University Medical Center ("OSUMC") (collectively "defendants").[1] The complaint sought damages for the alleged negligent delivery of Sooshyance at OSUMC in May 2008.  Plaintiffs later filed a related action in the Franklin County Court of Common Pleas against Dr. Artman, her professional corporation, and others.  The common pleas court dismissed the action against Dr. Artman and her corporation citing a lack of jurisdiction until the Court of Claims determined whether they were entitled to immunity under R.C. 9.86.

{¶ 3}   The Court of Claims scheduled an evidentiary hearing for November 5, 2012 to determine whether Dr. Artman was entitled to civil immunity.  The hearing did not occur until April 30, 2013, due in part to two continuances and a discovery dispute between Dr. Artman and defendants.  The evidence presented at the hearing included testimony from Dr. Artman, deposition testimony from Phillip Samuels, M.D., director of OSUMC's residency program for obstetrics and gynecology in 2008, and Robert Bornstein, Ph.D., vice dean for academic affairs at The Ohio State University College of Medicine ("College of Medicine").  The evidence established Dr. Artman, an OB/GYN, held a faculty position at The Ohio State University ("OSU") since 1991.  In 2008, she was an auxiliary (or courtesy) faculty member and did not receive monetary compensation.  In exchange for privileges to practice at OSUMC, Dr. Artman had to maintain certain requirements, such as teaching and involving residents in the care of her patients at OSUMC.

{¶ 4}   A magistrate found Dr. Artman was not a state officer or employee under R.C. 109.36, and, thus, not entitled to immunity under R.C. 9.86 and 2743.02(F).  The Court of Claims overruled Dr. Artman's objections to the magistrate's decision and adopted the decision as its own.

---

[1] The complaint also listed The Ohio State University Health System and The Ohio State University Medical Center Service Board as defendants, but the Court of Claims later deleted their names from the case caption as surplusage.

## II. ASSIGNMENTS OF ERROR

{¶ 5}   Dr. Artman appeals and presents three assignments of error for our review:

ASSIGNMENT OF ERROR #1:

THE MAGISTRATE ERRED WHEN IT RULED DR. ARTMAN DID NOT SATISFY THE ELEMENTS OF RC§109.36(A)(1)(a).

ASSIGNMENT OF ERROR #2:

THE MAGISTRATE ERRED WHEN HE REFUSED TO CONDUCT AN ANALYSIS OF WHETHER DR. ARTMAN SATISFIED THE ELEMENTS OF RC§109.36(A)(1)(b) AND REFUSED TO ADMIT THE EVIDENCE DR. ARTMAN PRODUCED AT HER IMMUNITY HEARING.

ASSIGNMENT OF ERROR #3:

THE MAGISTRATE ERRED IN DENYING DR. ARTMAN THE OPPORTUNITY TO FULLY PARTICIPATE IN HER IMMUNITY DETERMINATION UNDER RC§2743.02(F); BY DENYING HER A BRIEF CONTINUANCE; DENYING HER THE ABILITY TO CONDUCT REASONABLE DISCOVERY; AND THEN REFUSING TO ADMIT AND CONSIDER RELEVANT EVIDENCE SHE PRODUCED AT HER HEARING.

## III. DISCUSSION

{¶ 6}   R.C. 9.86 discusses the civil liability of state officers and employees, and provides, in relevant part:

[N]o officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of his duties, unless the officer's or employee's actions were manifestly outside the scope of his employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner.

"R.C. 9.86 is inclusive and makes no exception for persons who may simultaneously have other employment interests.  It provides immunity for all state employees [and officers] as long as they are acting within the scope of their employment when the injury occurs." *Theobald v. Univ. of Cincinnati,* 111 Ohio St.3d 541, 2006-Ohio-6208, ¶ 25.

{¶ 7} R.C. 2743.02(F) sets forth the procedure for determining the immunity granted by R.C. 9.86 and states in part:

> A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims that has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action. The officer or employee may participate in the immunity determination proceeding before the court of claims to determine whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code.

{¶ 8} " '[W]hether a doctor is entitled to personal immunity from liability under R.C. 9.86 involves a question of law, an issue over which the Court of Claims has exclusive, original jurisdiction.' " *Poe v. Univ. of Cincinnati*, 10th Dist. No. 12AP-929, 2013-Ohio-5451, ¶ 7, quoting *Marotto v. Ohio State Univ. Med. Ctr.,* 10th Dist. No. 12AP-27, 2012-Ohio-6158, ¶ 9, citing *Nease v. Med. College Hosps.,* 64 Ohio St.3d 396, 400 (1992). "If the Court of Claims determines the employee is immune from liability, the claimant in the underlying action must assert his or her claims against the state and the state shall be liable for the employee's deeds or omissions." *Id.* at ¶ 7, citing R.C. 2743.02(A)(2). "When deciding whether an individual is entitled to immunity under R.C. 9.86, the Court of Claims must determine (1) whether the individual was a state 'officer or employee,' and if so, (2) whether the individual was acting within the scope of employment when the cause of action arose." *Phillips v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 12AP-414, 2013-Ohio-464, ¶ 7, citing *Engel v. Univ. of Toledo College of Medicine*, 130 Ohio St.3d 263, 2011-Ohio-3375, ¶ 6. If the individual is not a state officer or employee, the analysis is complete and R.C. 9.86 does not apply. *See Engel* at ¶ 6, 21. R.C. 109.36(A) defines who is a state officer or employee for purposes of R.C. 9.86. R.C. 9.85(A).

{¶ 9} Because entitlement to immunity presents a question of law, we review the lower court's determination on this issue de novo. *State v. Gordon*, 10th Dist. No. 13AP-328, 2013-Ohio-5143, ¶ 9, citing *State v. Norfolk,* 10th Dist. No. 04AP-614, 2005-Ohio-336, ¶ 4.

A. *R.C. 109.36(A)(1)(a)*

{¶ 10} Under the first assignment of error, Dr. Artman contends she meets the definition of a state officer or employee under R.C. 109.36(A)(1)(a), i.e., she is "[a] person who, at the time a cause of action against the person arises, is serving in an elected or appointed office or position with the state or is employed by the state."

{¶ 11} First, Dr. Artman argues she was "employed by the state" when the action against her arose. Unfortunately, R.C. 109.36(A)(1)(a)'s definition of a state employee as a "person employed by the state" is "similar to analogous federal definitions in that it ' "is completely circular." ' " *Phillips* at ¶ 9, quoting *Bryson v. Middlefield Volunteer Fire Dept., Inc.,* 656 F.3d 348, 352 (6th Cir.2011), quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). "In cases where the term 'employee' is used in a federal statute but not helpfully defined, the United States Supreme Court instructs courts to rely on common law agency principles." *Id.* at ¶ 9, citing *Darden* at 322-24, *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40 (1989) (Copyright Act of 1976), and *NLRB v. United Ins. Co. of Am.*, 390 U.S. 254, 258 (1968) (National Labor Relations Act). "In this context, relevant considerations when determining ' "whether a hired party is an employee" ' include ' "the hiring party's right to control the manner and means by which the product is accomplished; * * * the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." ' " *Poe* at ¶ 10, quoting *Darden* at 323-24, quoting *Reid* at 751-52.

{¶ 12} In *Engel*, the Supreme Court of Ohio considered the issue of when an individual is employed by the state for purposes of R.C. 9.86 immunity. The *Engel* court

"set forth three 'helpful' factors which touch upon many of the considerations listed in *Darden,* though the court also 'emphasize[d] that other factors may be considered.' " *Poe* at ¶ 11, quoting *Engel* at ¶ 10.  "The three factors the court identified and examined were (1) whether the state and the alleged employee had a '[c]ontractual relationship,' (2) whether the state had control over the alleged employee's actions, and (3) whether the state, or a private entity with a 'symbiotic relationship' with the state, paid the alleged employee for his services."  *Id.,* citing R.C. 109.36(A)(1)(a), and *Engel* at ¶ 11, 15.  Here, several factors weigh against a finding that Dr. Artman was "employed by the state" within the meaning of R.C. 109.36(A)(1)(a).

{¶ 13} There is no evidence Dr. Artman had a written contract with OSUMC. However, Dr. Artman still maintains they had a contract. Dr. Artman suggests she received consideration in the form of privileges at OSUMC and patient care by residents, which freed up her time to treat and bill patients at her office.  According to Dr. Artman, OSUMC gave her these benefits in exchange for her securing a faculty appointment through a credentialing process that is "exhaustive and rigorous, and requires an offer and an acceptance with legally bargained for consideration before being entered into." (Appellant's brief, 38.)  As a faculty member, she had to follow the bylaws of OSU's medical staff, which required her to supervise residents in accordance with the requirements of the Accreditation Council for Graduate Medical Education ("ACGME"), which accredits OSU's residency program. Under the bylaws, she also had to convince reluctant patients to accept care from residents.  In addition, she had to submit to a formal review each year and document her resident teaching activities.

{¶ 14} Although Dr. Artman received privileges at OSUMC, her suggestion the resident care her patients got could have also constituted consideration is not persuasive. There is no evidence of how much money Dr. Artman earned because of this care. Moreover, Dr. Artman testified she also lost money due to her relationship with OSUMC because the time she spent teaching residents interfered with her time to treat patients at her office.  In addition, Dr. Artman provides no legal authority or analysis regarding her assertion that the credentialing process itself created a contract.

{¶ 15} Even assuming the arrangement between OSUMC and Dr. Artman was contractual, "a contractual arrangement 'd[oes] not necessarily equate to a contract of

employment.' " *Poe* at ¶ 20, quoting *Phillips* at ¶ 12. "In a variety of contexts, courts recognize that the mere granting of hospital privileges to a physician does not automatically confer employee status." *Phillips* at ¶ 12, citing *Bansal v. Mt. Carmel Health Sys.*, 10th Dist. No. 10AP-1207, 2011-Ohio-3827, ¶ 22; *Costell v. Toledo Hosp.*, 98 Ohio App.3d 586, 593 (6th Dist.1994); *Shah v. Deaconess Hosp.*, 355 F.3d 496 (6th Cir.2004). "Generally, in a contract creating an employment relationship, 'the employer agrees to pay the employee at an agreed rate,' and 'the employee agrees to perform work under the direction and control of the employer.' " *Poe* at ¶ 20, quoting *Lake Land Emp. Group of Akron, LLC v. Columber,* 101 Ohio St.3d 242, 2004-Ohio-786, ¶ 17. The arrangement Dr. Artman had with OSUMC does not conform to this basic structure.

{¶ 16} It is undisputed Dr. Artman did not receive monetary compensation from OSU during the time the cause of action against her arose. Regarding the issue of control, the evidence does not demonstrate OSU (including OSUMC and the College of Medicine) possessed a sufficient degree of control over Dr. Artman. " '[T]he right of control in the performance of work and the detailed manner in which the work is done' is the 'fundamental distinguishing element' of an employment relationship." *Poe* at ¶ 29, quoting *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm,* 11th Dist. No. 93-A1787 (Mar. 25, 1994). "In determining 'who has the right to control * * * [t]he factors to be considered include, but are certainly not limited to, such indicia as who controls the details and quality of the work; who controls the hours worked; who selects the materials, tools and personnel used; who selects the routes travelled; the length of employment; the type of business; the method of payment; and any pertinent agreements or contracts.' " *Id.*, quoting *Bostic v. Connor,* 37 Ohio St.3d 144, 146 (1988).

{¶ 17} Dr. Artman asserts OSUMC possessed control over her because to keep her faculty appointment and privileges, she had to follow the bylaws, supervise residents in accordance with ACGME standards, document sufficient teaching activities, and expose her patients to the risk of negligent care by residents. She also emphasizes the fact that OSUMC is a state institution as opposed to a private hospital.

{¶ 18} OSUMC's status as a state, versus private, institution does not prove OSU controlled Dr. Artman. Although Dr. Artman had an obligation to teach and supervise residents when she treated her patients at OSUMC, she points to no evidence that OSU

controlled the details of her teaching or supervision. For instance, there is no evidence she had to teach residents on specific topics or permit them to perform certain procedures on her patients. The bylaws specifically state, "[i]t is the responsibility of the attending physician to authorize each member of the limited staff to perform only those services which the limited staff member is competent to perform under supervision." Bylaws 3335-43-07(B)(3)(e). (Samuels Depo., exhibit No. 4, 32.) According to Dr. Artman, residents constitute limited staff members. Additionally, Dr. Artman fails to explain with any specificity how the ACGME requirements actually impact her.

{¶ 19} Although OSU could potentially revoke Dr. Artman's privileges to practice at OSUMC, OSU did not dictate her schedule. She did not have to work a certain number of shifts at OSUMC. OSU did not restrict her from admitting patients to other hospitals, dictate which patients she saw at her office, or make her admit a certain percentage of her patients to OSUMC. She did not have to provide care to OSU clinical patients or indigent patients, contribute to medical literature, teach lectures, or participate on committees. She did not have to provide written evaluations of residents. OSU did not bill Dr. Artman's patients for her professional services, collect on bills for her, or provide her with malpractice insurance. In contrast, OSU did not permit regular faculty to practice outside OSU, and in the OB/GYN department, full-time faculty had to see indigent and walk-in patients and teach a certain number of lectures per year. OSU paid regular faculty members, billed patients for them, and collected on the bills for them.

{¶ 20} Under these circumstances, we cannot agree the privileges granted by OSUMC gave OSU a sufficient degree of control over Dr. Artman to demonstrate an employment relationship. *See Phillips* at ¶ 13 (finding OSUMC did not control doctor, even though it could revoke her privileges to practice at the hospital, which doctor argued were "contingent on her ability to secure a faculty appointment, maintain specific credentials, and contribute to the academic mission of the department," since doctor's "ability to practice medicine" was not influenced by OSUMC).

{¶ 21} " 'Although courts have found a physician to be an employee of a state university even where he or she is not directly paid by the university, this has only been so where a "symbiotic relationship" exists between the university and the physician's practice plan.' " *Phillips* at ¶ 15, quoting *Engel* at ¶ 15, and citing *Potavin v. Univ. Med. Ctr.*, 10th

Dist. No. 00AP-715 (Apr. 19, 2001). The *Engel* court referenced *Potavin* as an example of when a symbiotic relationship existed. *Engel* at ¶ 15. We summarized *Potavin* in *Poe*:

> In Potavin, this court held that a volunteer clinic instructor for the University of Cincinnati College of Medicine's OB/GYN department who was compensated solely by a private practice group was a state employee for purposes of R.C. 9.86 immunity because the record showed the university had a "high degree" of control over the private practice group. In fact, we held that the practice group and the university "functioned as one entity" where compensation of practice group employees was subject to the approval of the dean of the college of medicine, the practice plan contributed profits from its medical services billings, which accounted for a substantial portion of the OB/GYN department's budgetary funds, and the dean had "the authority and the power" to unilaterally transfer funds from the practice group to the university. Id. Furthermore, as the University of Cincinnati's College of Medicine's OB/GYN department actually "created" the private practice group pursuant to university approval, the director of the OB/GYN department testified that the practice plan "wouldn't exist without the University of Cincinnati because it couldn't exist." Id. Based on these considerations, the Potavin court determined that the university "intended to compensate" the alleged employee "by funds collected and distributed by [the private practice group]."

(Citations omitted.) *Poe* at ¶ 40.

{¶ 22} In contrast, in *Phillips*, we found no symbiotic relationship existed between OSUMC and the practice group of the alleged state employee, Dr. Carol Greco. *Phillips* at ¶ 15-16. We noted the lack of evidence OSUMC dictated the budget of the practice group or that the practice group could not exist without its relationship with OSUMC. *Id.* at ¶ 16. OSUMC did not provide Dr. Greco with malpractice insurance or collect her billings or fees for professional services. *Id.*

{¶ 23} Dr. Artman argues she benefits from her access to OSUMC's facility and residents. In turn, OSU benefits from her supervision of residents. According to Dr. Artman, OSU's OB/GYN department has 87 unpaid auxiliary faculty members who account for as much as 20 percent of the supervisory coverage OSU needs for its residency program to stay accredited. Without that accreditation, OSU would lose funding from Medicare and Medicaid, and its medical students would not be eligible for state licensure.

Dr. Artman also contends OSU makes money by billing patients of unpaid auxiliary faculty for items aside from the professional services of those faculty members.

{¶ 24} However, Dr. Artman testified her salary comes from her practice group, i.e., her professional corporation. Thus, the symbiotic relationship analysis in this case centers on the relationship between OSU and Dr. Artman's corporation. *See Poe* at ¶ 40 (indicating a symbiotic relationship inquiry considers whether the state entity and private practice group are so intertwined as to suggest a physician's direct payment from the practice group can be viewed as payment from the state entity as well). Dr. Artman points to no evidence her corporation cannot exist without OSU. The mere fact the corporation might have benefited from Dr. Artman's access to OSUMC's facilities and residents does not prove the corporation is dependent on OSU. Dr. Artman acknowledged OSU does not have an ownership interest in the corporation. As in *Phillips*, and unlike in *Potavin*, there is no evidence OSU dictated the budget of Dr. Artman's corporation. As in *Phillips*, OSUMC did not provide Dr. Artman with malpractice insurance or collect her billings or fees for professional services.

{¶ 25} Dr. Artman's corporation appears to consist of two physicians including herself. Even if the second physician was also an unpaid auxiliary faculty member in OSU's OB/GYN department, the contributions of the other 85 faculty to OSU do not prove a symbiotic relationship exists between the corporation and OSU. The record is devoid of evidence on how much resident supervision time Dr. Artman's corporation contributes to OSU or how much money OSU makes from the corporation's patients. It seems unlikely OSU's ability to function would be significantly impaired by the absence of contributions from the two physicians in Dr. Artman's corporation.

{¶ 26} In her symbiosis discussion, Dr. Artman claims in a separate action Andrew Thomas, M.D., testified OSU's unpaid auxiliary faculty receive free continuing medical education classes and unlimited access to the Health Sciences Library. Dr. Artman notes the Court of Claims precluded her from deposing Dr. Thomas in this case, so she could not obtain this "extremely important piece of evidence." (Appellant's brief, 42.) However, if Dr. Artman received benefits in the form of free classes and library access, we fail to see why she could not testify as to them. Moreover, to the extent Dr. Artman argues the Court of Claims erred by refusing to let her depose Dr. Thomas, the issue is beyond the scope of

the assigned error, so we need not address it. *See Anderson v. Preferred Title & Guaranty Agency, Inc.*, 10th Dist. No. 13AP-385, 2014-Ohio-561, ¶ 11 (explaining this court rules on assignments of error only and will not address mere arguments).

{¶ 27} Finally, Dr. Artman contends other factors outside the three identified in *Engel* support a finding she was employed by the state. However, her claim that OSU "controls the manner and means" by which she provides "patient care under its roof" is vague. (Appellant's brief, 44.) Her contention that OSU "controls the method of compensation" is also vague and confusing given her acknowledgement that OSU does not bill for her services or give her monetary compensation. (Appellant's brief, 45.) In addition, Dr. Artman's claim that she must supervise residents during "all the time she enters OSU" is unsupported by the record. (Appellant's brief, 45.) Dr. Artman also argues OSUMC provides her with facilities and tools to treat patients, but this is simply another way of saying she has privileges at OSUMC, which we already addressed. Although Dr. Artman and OSU have worked together for many years, the length of their relationship is not sufficient to overcome the lack of evidence they had an employer-employee relationship in 2008.

{¶ 28} Based on the foregoing, we agree with the Court of Claims' conclusion that Dr. Artman was not "employed by the state" for purposes of R.C. 109.36(A)(1)(a).

{¶ 29} Next, Dr. Artman argues at the time the cause of action against her arose, she served in an appointed position with the state under R.C. 109.36(A)(1)(a). Specifically, she was appointed to OSU's faculty. In support of her contention, Dr. Artman contrasts her position with that of the doctor in *Engel.*

{¶ 30} In *Engel*, the Supreme Court rejected the contention that Dr. Skoskiewicz occupied a position or office with the state under R.C. 109.36(A)(1)(a) because of his "appointment" as a clinical assistant professor at the University of Toledo College of Medicine. *Engel* at ¶ 18-19. The court explained " '[a] public officer, as distinguished from an employee, must possess some sovereign functions of government to be exercised by him for the benefit of the public either of an executive, legislative, or judicial character. * * * "[T]he chief and most decisive characteristic of a public office is determined by the quality of the duties with which the appointee is invested, and by the fact that such duties are conferred upon the appointee by law." ' " *Id.* at ¶ 19, quoting *State ex rel. Newman v.*

*Skinner*, 128 Ohio St. 325, 327 (1934), quoting *State ex rel. Landis v. Bd. of Commrs. of Butler Cty.*, 95 Ohio St. 157, 159 (1917).

{¶ 31} The *Engel* court found Dr. Skoskiewicz "possessed no 'sovereign' function of an executive, legislative, or judicial character" and "his duties were not of a level consonant with those of a public office." *Id.* The court noted the doctor's appointment did not entitle him to office space, staff, or authority at the college of medicine. *Id.* The appointment did not enable him to lecture or teach classes, conduct university-sponsored research, practice at the university clinic, or receive payment from the college of medicine. *Id.* Dr. Skoskiewicz simply had students rotate through his practice as part of one-month clerkships. *Id.* The appointment imposed no duties on him, and, to the extent compliance with the college of medicine's policy guidelines constituted a duty, it was not a duty conferred by law. *Id.*

{¶ 32} Dr. Artman argues unlike Dr. Skoskiewicz, she was appointed to the College of Medicine faculty; however, as noted above, Dr. Skoskiewicz did have a faculty appointment. In addition, Dr. Artman contends unlike Dr. Skoskiewicz, she was credentialed by OSUMC and had privileges to practice at OSUMC, where she could direct OSUMC staff. She had the option to teach and lecture at the College of Medicine and was "entitled" to conduct research. (Appellant's brief, 46.) She received payment in the form of resident care for her patients. In addition, Dr. Artman argues because the bylaws she had to follow were incorporated into the Ohio Administrative Code, she had a legal duty to supervise residents.

{¶ 33} We fail to see how Dr. Artman's participation in a credentialing process proves she had a position with the state. Even if we agreed Dr. Artman had a legal duty to supervise residents, that is not a sovereign function of an executive, legislative or judicial character or a duty of a level consonant with those of a public office. Likewise, we do not believe a doctor's ability to treat her own private patients at a hospital and utilize the hospital's staff and residents in providing that treatment qualifies as a sovereign function. *See Phillips* at ¶ 3, 17 (finding an auxiliary faculty member at OSUMC did not serve in an elected or appointed office or position with the state where she did not receive monetary compensation but received privileges to practice at OSUMC in exchange for, among other things, teaching residents). *Id.* at ¶ 3. Although the *Engel* court discussed Dr.

Skoskiewicz's inability to lecture and conduct university-sponsored research, the court did not find those abilities alone prove a doctor occupies a position with the state.  In this case, we find Dr. Artman's options to lecture and conduct research do not qualify as sovereign functions sufficient to elevate her faculty appointment to a position with the state. Accordingly, we find Dr. Artman did not serve in an appointed position with the state at the time the cause of action against her arose.

{¶ 34} For the foregoing reasons, we find Dr. Artman was not a state officer or employee under R.C. 109.36(A)(1)(a), and we overrule the first assignment of error.

B. *R.C. 109.36(A)(1)(b)*

{¶ 35} Under her second assignment of error, Dr. Artman argues she met the definition of a state officer or employee under R.C. 109.36(A)(1)(b), but the magistrate erred by refusing to conduct an analysis under that subsection and also by excluding evidence she produced at the immunity hearing.

{¶ 36} Under R.C. 109.36(A)(1)(b) an officer or employee means "[a] person that, at the time a cause of action against the person, partnership, or corporation arises, is rendering medical, nursing, dental, podiatric, optometric, physical therapeutic, psychiatric, or psychological services pursuant to a personal services contract or purchased service contract with a department, agency, or institution of the state."

{¶ 37} Dr. Artman suggests the magistrate ignored her arguments under this subsection because shortly after the immunity hearing began, the magistrate made some comments about our decision in *Phillips* (which focused on R.C. 109.36(A)(1)(a)), and the magistrate later excluded evidence pertinent to one of Dr. Artman's R.C. 109.36(A)(1)(b) arguments.  However, the magistrate never indicated he would not consider R.C. 109.36(A)(1)(b) and, as we explain below, Dr. Artman failed to demonstrate error in the exclusion of her evidence. Additionally, the magistrate's decision explicitly considered, and rejected, her R.C. 109.36(A)(1)(b) argument.  Although the decision did not analyze the issue in depth, Dr. Artman never requested findings of fact and conclusions of law. *See* Civ.R. 53(D)(3)(a)(ii).

{¶ 38} Next, Dr. Artman contends during Sooshyance's delivery, she was rendering medical services, namely "the delivery of patient care under her supervision," pursuant to the arrangement with OSU as described above, which constitutes a personal services

contract. (Appellant's brief, 50.) But, again, Dr. Artman had no written contract with OSU. Even if her arrangement with OSU was contractual, she was not obligated to render medical services pursuant to that contract. Under her arrangement with OSU, Dr. Artman did not have to provide medical services to Sooshyance, his mother, or anyone else. At most, she had an obligation to render some type of supervisory or teaching services to residents when she elected to treat her own patients at OSUMC. Dr. Artman provides no legal authority for the position that supervision and teaching qualify as "medical services" for purposes of R.C. 109.36(A)(1)(b) simply because they occur in a medical setting. Therefore, we reject her argument.

{¶ 39} Next, Dr. Artman claims at the time the action against her arose, she was rendering medical services pursuant to a personal services or purchased service contract between her practice group and The Ohio University Health Plan, Inc. ("OSU Health Plan"), which insured plaintiffs. Dr. Artman argues the OSU Health Plan is a department, agency or institution of the state. However, the only evidence Dr. Artman points to in support of this contention are exhibits not admitted into evidence. Dr. Artman contends the magistrate, and presumably the Court of Claims, erred in excluding them.

{¶ 40} "The admission or exclusion of evidence is within the discretion of the trial court, and thus, an appellate court will not reverse an evidentiary ruling absent a showing of an abuse of discretion." *Cargile v. Ohio Dept. of Adm. Servs.*, 10th Dist. No. 11AP-743, 2012-Ohio-2470, ¶ 14, citing *Banford v. Aldrich Chem. Co., Inc.*, 126 Ohio St.3d 210, 2010-Ohio-2470, ¶ 38. An abuse of discretion implies the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 41} Initially, Dr. Artman suggests her exhibits should have been admitted because the magistrate indicated she "could submit any evidence she wished to at the hearing." (Appellant's brief, 58.) However, the magistrate never gave Dr. Artman free reign to submit evidence without regard to evidentiary or other legal rules.

{¶ 42} Dr. Artman contends the magistrate erred in excluding the agreement between her practice group and the OSU Health Plan.[2] She points to nothing in the agreement proving the OSU Health Plan constitutes a department, agency or institution of the state. Thus, the agreement's relevance depends on whether Dr. Artman proved, through other admissible evidence, that the OSU Health Plan met that requirement. As we explain below, she failed to prove this, so the agreement was properly excluded.

{¶ 43} Next, Dr. Artman complains the magistrate should have admitted a printout from OSU's webpage listing the OSU Health Plan as a university department. Contrary to Dr. Artman's contention, even if the printout was otherwise admissible, it does not constitute an admission that the OSU Health Plan is a department of the state for purposes of R.C. 109.36. The printout has marginal, if any, relevance, so any error in its exclusion was harmless. *See* Civ.R. 61.

{¶ 44} Dr. Artman also argues the magistrate should have admitted the OSU Health Plan's articles of incorporation into evidence. Dr. Artman claims statements in the articles demonstrate the OSU Health Plan's sole purpose was to carry out OSU's mission, the plan's initial directors were high ranking officials at OSU, and the plan received funding from OSU. She claims the articles are "non-hearsay under Evid R 801(8)" and "self-authenticating under Evid R 902(1)." (Appellant's brief, 62.)

{¶ 45} Dr. Artman never offered the articles as evidence during the immunity hearing but, instead, included them in a post-hearing proffer made outside the magistrate's presence. *See, e.g.,* Evid.R. 103(A)(2) (suggesting a proffer should follow an adverse ruling on admissibility). *But see* Civ.R. 53(D)(4)(d) (stating in ruling on objections to a magistrate's decision, a court may hear additional evidence). The magistrate and Court of Claims did not specifically address the admissibility of the articles. However, as Dr. Artman suggests, the articles could have been excluded on hearsay grounds because she wanted to use the out-of-court statements in them to prove the truth of the matters asserted therein. *See* Evid.R. 801(C). Dr. Artman argues the articles are non-hearsay under Evid.R. 801(8), but such a rule does not exist. Even if Dr.

---

[2] This agreement is actually between the practice group and The Ohio State University Managed Health Care Systems, Inc. However, according to other information Dr. Artman proffered, the corporation changed its name to the OSU Health Plan in 2009.

Artman made a typographical error, she still provided no analysis to substantiate her argument. Thus, she failed to show the articles were admissible.

{¶ 46} In addition, Dr. Artman argues the magistrate should have admitted the OSU Health Plan 2013 Provider Manual into evidence. Dr. Artman contends the manual's statement that the OSU Health Plan is "[s]elf-funded through OSU, not a health insurance corporation" constitutes evidence the OSU Health Plan is a state agency, department or institution. (R. 93, exhibit A, 2.) Dr. Artman argues the manual is self-authenticating under Evid.R. 902(7) and not hearsay as an admission by a party-opponent. Her argument ignores the fact that she never offered the manual as evidence until after the magistrate issued a decision and she filed her objections. The Court of Claims struck the manual from the record on defendants' motion because it was "not before the magistrate and has little relevance." (R. 96, Judgment Entry.) As OSUMC points out, the manual is dated five years after the treatment at issue in this case occurred. Dr. Artman does not address the basis for the Court of Claims' ruling, so even if we agreed with her other arguments, we could not reverse the decision to strike the manual.

{¶ 47} Given our rulings on these evidentiary issues, we must reject Dr. Artman's argument that she is entitled to immunity under R.C. 109.36(A)(1)(b) based on her practice group's agreement with the OSU Health Plan.

{¶ 48} Next, Dr. Artman contends the magistrate and Court of Claims erred by excluding from evidence a copy of OSU's Medicare Cost Report she downloaded from the Internet. Instead of specifying why the report was admissible, she complains about OSU's conduct during discovery with regard to Medicare information. Thus, there is no argument for us to address on this issue.

{¶ 49} Finally, Dr. Artman makes an argument about her ability to conduct depositions. Though unclear, it appears she is referring to three depositions she wanted to take, but could not. Defendants filed a motion for a protective order to prohibit these depositions, which the magistrate granted and the Court of Claims refused to set aside. Dr. Artman's argument does not specifically address the protective order or explain why it was erroneous under Civ.R. 26(C). In any event, this issue is beyond the scope of the assigned error, which involves an R.C. 109.36(A)(1)(b) analysis and the exclusion of

evidence, not the granting of a protective order. Therefore, we do not consider this issue. *See Anderson* at ¶ 11.

{¶ 50} Accordingly, we overrule the second assignment of error.

C. *Dr. Artman's Participation in the Immunity Hearing*

{¶ 51} Under the third assignment of error, Dr. Artman complains that the magistrate denied her the opportunity to fully participate in the immunity determination under R.C. 2743.02(F). Specifically, Dr. Artman complains OSU "was permitted to ignore the rules of discovery," which caused her to miss out on "some valuable information that would have benefited her case." (Appellant's brief, 64-65.) She complains R.C. 2743.02(F) has no meaning if she cannot use the civil rules to conduct discovery, and "for this reason alone" she is entitled to a new immunity hearing "with the benefit of a couple more depositions." (Appellant's brief, 65.) Dr. Artman also argues the magistrate erred by denying her a brief continuance to conduct more discovery. In addition, she argues fundamental fairness demanded the Court of Claims admit her exhibits.

{¶ 52} Dr. Artman's claim regarding her exhibits is too vague for this court to analyze. Likewise, Dr. Artman's arguments about discovery are vague. Dr. Artman fails to articulate what discovery she needs that the magistrate and Court of Claims did not permit and why that constituted error. Without that information, Dr. Artman cannot show her entitlement to a continuance for the purpose of conducting discovery.

{¶ 53} Accordingly, we overrule the third assignment of error.

## IV. CONCLUSION

{¶ 54} Having overruled appellant's three assignments of error, we affirm the judgment of the Court of Claims of Ohio.

*Judgment affirmed.*

CONNOR and LUPER SCHUSTER, JJ., concur.

————————